IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON

**TYLER WARD BOWCOTT,**

    **Plaintiff,**

v.                                                                      **Civil Action No. 3:17-cv-02329**

**NANCY A. BERRYHILL,**
**ACTING COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

Pending before this Court is Plaintiff's Memorandum in Support of Judgment on the Pleadings (ECF No. 14) and Brief in Support of Defendant's Decision (ECF No. 15). This is an action seeking review of the decision of the Commissioner of Social Security denying Claimant's application for children's insurance benefits under Title II of the Social Security Act.

### Background

Claimant, Tyler Ward Bowcott, filed an application for Children's Insurance Benefits on October 22, 2013. Claimant alleged disability beginning June 10, 2014. The claim was denied initially on November 21, 2013, and upon reconsideration on May 12, 2014.[1] Claimant filed a request for hearing on June 9, 2014. A video hearing was held on December 7, 2015. Claimant appeared in Huntington, West Virginia, and the Administrative Law Judge (ALJ) presided over the hearing from St. Louis, Missouri. The ALJ denied Claimant's application on July 8, 2015. On September 4, 2015, Claimant requested the Appeals Council review the ALJ's decision. The Appeals Council denied Claimant's request for review on February 13, 2017. On April 13, 2017,

---

[1] These are the dates as reflected in the Administrative Law Judge's decision, Claimant's brief and Defendant's brief.

Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

## Standard of Review

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. *See Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520 and 416.920 (2017). If an individual is found "not disabled" at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a) and 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b) and 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. *Id.* §§ 404.1520(c) and 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* §§ 404.1520(d) and 416.920(d). If it does, the claimant is found disabled and awarded benefits. *Id.* If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(e) and 416.920(e). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f) and 416.920(f)

(2017). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2)    We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
> (3)    We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration,

3

>persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
>
>(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none"or "mild"in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1). Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

>At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the

> significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity during the period of time from his alleged onset date of June 10, 2014 (Tr. at 13). As of June 10, 2014, Claimant had not attained age 22.[2] Under the second inquiry, the ALJ found that Claimant suffers from the medically determinable impairment of autistic disorder. (*Id.*) However, the ALJ found that Claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments (Tr. at 14). The ALJ found that Claimant has the residual functional capacity to perform a full range of work at all exertional levels except Claimant is limited to brief and superficial interaction with the public or co-workers (Tr. at 15). The ALJ found that Claimant has no past relevant work (Tr. at 22). The ALJ concluded that Claimant was not under a disability at any time from June 10, 2014, through the date of this decision (Tr. at 24).

## Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In *Blalock v. Richardson*, substantial evidence was defined as:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a

---

[2] The Earliest Onset Date for a claimant for Childhood Disability Benefits Claims must be before the claimant reaches the age of 22 years old. Claimant was born on July 27, 1995, therefore, he was not 22 years old on the alleged onset date of June 10, 2014.

> verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Cellebreze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

## Claimant's Background

Claimant was born on July 27, 1995. He has a high school education. He does not have a driver's license. He lives with his mother, his sister and his sister's children. (*Id.*)

## Medical Record

The medical record has been adopted, as set out in the Claimant's Brief, Defendant's Brief and the ALJ's decision to the extent as follows.

In 2002, Claimant was diagnosed with Asperger's syndrome at the age of 7 years old (Tr. at 362, 374). Behavioral observations at that time revealed that Claimant was cooperative and friendly; willing to attempt each task presented; and that he had adequate effort and motivation on testing (Tr. at 375). Intellectual functioning tests revealed that Claimant had a full scale IQ of 106, which was in the average range (Tr. at 375, 376). Claimant was assigned a global assessment of functioning (GAF) score of 65, which indicates only mild symptoms or some difficulty in social, occupational, or school functioning. Diagnostic and Statistical Manual of Mental Disorders(DSM-IV-TR) 34 (4th ed. 2000).

In 2008, Claimant underwent additional intellectual testing (Tr. at 418-443). On July 22, 2008, Claimant was administered the Wechsler Individual Achievement Test – Second Edition (WIAS-II) and achieved reading composite and written language scores in the average range and mathematic composite scores in the low-average range (Tr. at 434). On July 22, 2008, Claimant was administered the Wechsler Intelligence Scale for Children – Fourth Edition (WISC -IV). His scores revealed that he functioned in the superior range for verbal comprehension, average range for perceptual reasoning and working memory and borderline range for processing speed (Tr. at 432). On August 29, 2008, Claimant was administered the Reynolds Intellectual Assessment Scales (RIAS). His scores fell in the high average range and specifically indicated that he was very strong in memory skills, both verbal and non-verbal (Tr. at 429, 430).

Claimant was given a speech and language evaluation on August 26, 2009. His speech and language skills were "within normal limits for his age and development" (Tr. at 443).

In high school, Claimant received services under a 504 Educational Plan pursuant to which his assignments were graded based on content, not handwriting mechanics; he received extended time for assignments and tests; he was permitted to type assignments when appropriate; and take tests in a small group setting (Tr. at 446). School records reveal that Claimant had reached mastery levels in reading, math, and written language by May 2013, and he continued to be placed in regular classes (Tr. at 444).

On August 20, 2013, a form completed by Adam Watson, Assistant Principal at Claimant's high school, indicated that Claimant had been diagnosed with Asperger's, had some difficulty with organization and social skills and received reduced assignments and small group testing (Tr. at 411). A form completed by Claimant's high school health and library teacher[3] indicated that

---

[3] The teacher questionnaire does not reflect the teacher's name or the date the form was completed (Tr. at 333-340).

7

Claimant's reading, math and written language were on level (Tr. at 333).

On November 16, 2013, Claimant was examined by Elizabeth Bodkin, M.A., at the request of the state agency (Tr. at 412). Claimant reported that he did not receive mental health treatment, but that he used an antidepressant and blood pressure medication but could not recall the names of the medications (Tr. at 413). Claimant reported that he was in 12th grade and received some accommodations pursuant to a 504 plan. (*Id.*) Claimant stated that he was the youngest of three kids and had fair relationships with the members of his family (Tr. at 414). He also stated that his daily activities include the following. "I normally go to school. I'll comment on what's going on in class. I do socialize a little bit. I don't start conversations, but I try to make myself engage in them. I talk to a few friends. I usually do my own thing, and they'll ask me to vacuum and do dishes and take out the trash and clean stuff at home and I'll do whatever they ask me to do, and I work really hard to engage socially" (Tr. at 415).

On mental status examination, Claimant was cooperative and had a good attitude; interacted appropriately; made normal eye contact; had adequate verbal responses (both length and depth); engaged in spontaneous conversation; had relevant and coherent speech; normal tone and pace; was fully oriented; had a dysphoric mood and restricted affect; normal thought process; normal thought content; no perceptual disturbances; fair insight; and judgment within normal limits (Tr. at 414). Claimant had normal recent and remote memory; normal concentration; and normal psychomotor behavior. (*Id.*) Ms. Bodkin administered the WAIS-IV and Claimant received a full-scale IQ score of 111. (*Id.*) Ms. Bodkin assesses Claimant with a diagnosis of Asperger's disorder by history (Tr. at 415). She explained that her diagnosis was based upon Claimant's report that he was`

> …very intense with my interest and usually pursue it aggressively.
> Typically when I get interested in something it's kind of hard to get

> me off of it. Sometimes I do have trouble socializing. Occasionally I do have a hard time understanding some of the social things that I'm supposed to get and sometimes I'll say things that can hurt other people's feelings and not realize that it's socially inappropriate. And I get real anxious and really nervous when I'm not on my medicine and it kind of helps me focus and I work really hard to make eye contact and do the socially appropriate things that I'm supposed to do.

(Tr. at 415). Regarding Claimant's social functioning, Ms. Bodkin opined that based on mental status examination and clinical observation, Claimant interacted appropriately and his social functioning was "within normal limits" (Tr. at 416). Ms. Bodkin also opined that Plaintiff's persistence, i.e., his ability to stay on task, and his pace were within normal limits based on clinical observations (Tr. at 416).

On November 20, 2013, Chester Frethiem, Psy.D., reviewed the records and completed a psychiatric review technique form (PRTF) which indicated that Claimant had mild restriction in his activities of daily living, moderate difficulties in social functioning and no difficulties with concentration, persistence, or pace (Tr. at 64). Dr. Frethiem also completed a mental residual functional capacity (MRFC) assessment and opined that Claimant had no understanding and memory limitations; no concentration and persistence limitations; was moderately limited in the ability to interact appropriately with the general public, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and was not significantly limited in the ability to ask questions or request assistance, and to accept instructions and respond appropriately to criticism from supervisors (Tr. at 65). Dr. Frethiem explained that Claimant had a history of mild Asperger's that improved over time (Tr. at 66). Dr. Frethiem also explained that he was giving Claimant the benefit of the doubt regarding his social functioning limitations based on his history of Asperger's and his mother's reports of significant social limitations (Tr. at 66).

Dr. Frethiem explained that Claimant would be "capable of work like activities that do not place heavy demands upon his capacity for social interaction" (Tr. at 66). On February 21, 2014, Frank Roman, Ed.D., reviewed the record and affirmed Dr. Frethiem's assessment as written (Tr. at 76).

Claimant's high school teacher, Brianne Solomon, also completed a questionnaire on May 21, 2014. Ms. Solomon indicated that Claimant's reading level was "on target," but that his math and written language levels were "low" (Tr. at 447). Ms. Solomon indicated that Claimant had serious and very serious problems in various categories in each domain, and some obvious problems, slight problems, or no problem in a number of other categories in each domain (Tr. at 447-454). Ms. Solomon reported that Claimant received extended time to complete assignments and tests (Tr. at 446). Ms. Solomon stated the following:

> During various times during Tyler's instruction, he's needed a variety of scaffolding. Tyler has had periods of time where he could not sit beside certain people, or could only work if permitted to take off his shoes/socks, or could sit under a table with no classmates speaking to him. Tyler shows signs of stress around other individuals who cannot be on task. Sometimes he has to leave the room. He constantly blurts out things that are inappropriate, leaving others in discomfort. His writing is illegible and he has trouble solving basic math problems. (Tr. at 448).
> \*\*\*
> Tyler has trouble seeing something through to completion. If he is not constantly reminded, the task may be abandoned. If he construes a mistake of any kind during any stage of completion, he is known to destroy his project, leaving him back at square one. Tyler also has trouble in disrupting others with outbursts and time off-task. If teachers were not focused on Tyler as much as they are here at our small school, his grades would not be close to what they currently are. (Tr. at 449).
> \*\*\*
> If medication is missed, Tyler becomes incapable of regulating negative feelings (Tr. at 453).

Ms. Solomon gave a general explanation of the nature and characteristics of Claimant's impairment:

> Tyler has Asperger's Syndrome on the Autism Spectrum as defined in the DSMIV. This explains his problems regulating emotions, relating with others, and fine- motor issues as well as nuances of OCD [Obsessive-Compulsive Disorder].
>
> ….
>
> Asperger's Syndrome does not have a cure. It can only be maintained and titrated. Tyler will struggle with these problems for the rest of his life.

(Tr. at 453).

On March 31, 2015, Kristen Robinson, M.A., M.Ed., completed a checkbox mental assessment of Claimant's ability to do work-related activities (Tr. at 465). Ms. Robinson opined that Claimant had moderate limitations in his ability to follow work rules, use judgment, interact with supervisors, and function independently, and marked limitations in his ability to relate to co-workers, deal with the public, deal with work stresses, and maintain attention or concentration (Tr. at 466). She also opined that Claimant had marked and extreme limitations in his ability to understand, remember, and carry out job instructions; moderate limitations in his ability to relate predictably in social situations, to complete a normal workday and week without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods; and slight limitations in maintaining personal appearance and behaving in an emotionally stable manner (Tr. at 466).

On April 24, 2015, Dr. Sean DiCristofaro completed a checkbox mental assessment of Claimant's ability to do work-related activities and opined that Claimant had the following: moderate, marked, and extreme limitations in his ability to make occupational adjustments; marked limitations in his ability to understand, remember, and carry out complex and detailed job instructions; slight limitations in his ability to understand, remember, and carry out simple job instructions; and moderate and marked limitations in his ability to adjust personally and socially (Tr.

11

at 457-458). Dr. DiCristofaro also noted extreme limitations in Claimant's ability to deal with the public, interact with supervisors and maintain attention/concentration and further explained that Claimant had "Emotional liability due to underlying condition" and "Is unable to perform structured work independently." (Tr. at 458).

Claimant's Testimony

Claimant testified that he was born in 1995 and graduated from high school in 2014 (Tr. at 36). He attended regular high school classes and graduated timely with the rest of his class (Tr. at 36). He did not have to repeat any subjects, but he testified that he struggled in math (Tr. at 40). Claimant did not have an IEP[4] in high school, nor did he receive services from a tutor or therapist. Instead, Claimant got certain accommodations including extra time to take tests, pursuant to a 504 education plan (Tr. at 38). Claimant took the bus to school and testified that he had a "handful of friends and people that I talk to in school," but that he did not socialize with anyone outside of school (Tr. at 41, 45).

Since graduating from high school, Claimant testified that he has "not been doing much of anything," and spends most of his time using the internet or playing video games (Tr. at 36). Claimant stated that he lives in Milton, West Virginia, with his mother, sister, nieces and nephews (Tr. at 36-37). He testified that he helps with chores (Tr. at 38, 41). He stated that he could not work because he did not think he could handle himself well in a work environment (Tr. at 38). Specifically, he testified that he would not "do very well under the pressure of having a job . . . [and] needing to support myself." (*Id.*) He testified that he does not take any medication to help with concentration, but that he was currently taking antidepressants (Tr. at 40).

Claimant testified that he was suspended once from school in 8th or 9th grade due to

---

[4] IEP stands for Individualized Education Program.

threatening another student (Tr. at 41). Claimant testified that he had not attempted to get his driver's license because he was afraid to drive (Tr. at 41-42). Claimant stated that he worried that he "would end up possibly causing an accident, and I don't want to risk hurting anybody" (Tr. at 42). Claimant testified "it's a little bit more difficult than it seems, to be honest. Like sometimes I say I can do something, but then when it comes down to it, I have a much harder time actually doing it." (*Id.*) He said that he is worried that he would end up losing his concentration and causing an accident (Tr. at 43).

### Witness Testimony

Claimant's mother, Olissa Lucy, also testified at the administrative hearing (Tr. at 49-55). Ms. Lucy testified that in order for Claimant to perform a small chore, he has to "have someone kind of standing over him just sort of pointing out, you know, you will need to do this" (Tr. at 49). She stated that Claimant was unable to handle more than one task at a time (Tr. at 50). She also stated that he spent most of his time in his room (Tr. at 52). Ms. Lucy also testified that he preferred to be alone because he could not handle the pressure of crowds and noise (Tr. at 52-53). She stated that her son had declined since graduating from school one year earlier, and that his transition from "being in high school to being in the real world" has been difficult (Tr. at 54). Ms. Lucy testified that changing different activities at school would sometimes "set him off. And he would have meltdowns" (Tr. at 51). She testified that Claimant can't deal with being rushed. (*Id.*) She stated that he would cry and not cooperate.

### Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the ALJ "failed to fully and fairly develop the record regarding the nature and characteristics of Asperger's Syndrome, resulting in multiple, successive errors and a

decision denying benefits that are not supported by substantial evidence" (ECF No. 14). Claimant argues:

> [T]he ALJ failed to obtain an understanding of autism spectrum disorder and to seek out the knowledge necessary to evaluate [Claimant's] alleged disabling impairment – Asperger's Syndrome – as part of that spectrum of disorders. Consequently, the ALJ failed to recognize probative evidence that proved the severity of [Claimant's] mental impairment and that supported additional Paragraph B and RFC limitations. As a result, the ALJ's step three finding that [Claimant's] autism disorder did not meet or equal Listing 12.10, the weight he assigned to multiple source opinions, and his RFC and credibility analyses are not based on substantial evidence. (*Id.*)

In response, Defendant asserts that "Substantial evidence supports the ALJ's finding that Plaintiff did not meet or equal Listing 12.10"[5] (ECF No. 15). Defendant avers that substantial evidence supports the ALJ's residual functional capacity (RFC) assessment.

## Residual Functional Capacity (RFC)

Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record, including the effects of treatment and the limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication. *Id.* at *5. Social Security Ruling 96-8p explains that the RFC "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Monroe v. Colvin,* 826 F.3d 176, 179-80. (4th Cir. 2016). (citing *Mascio v. Colvin*, 780 F.3d 632, 635 (4th Cir. 2015). (quoting SSR 96-8p, 61 Fed. Reg. at 34, 478; see also *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (observing that the ALJ "must build an accurate and logical bridge from the evidence to his conclusion").

---

[5] Listing 12.10 addresses autism spectrum disorder.

An RFC refers to the most a claimant can still do despite his limitations and is an assessment that is based upon all of the relevant evidence, including descriptions of limitations. 20 C.F.R. §§ 416.945(a), 404.1545. The Fourth Circuit has held that "[a] necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling," including "a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013).

The final responsibility for determining a claimant's RFC is reserved to the Commissioner, who will not give any special significance to the source of another opinion on this issue. 20 C.F.R. §§ 416. 927(d)(2), (3), 404.1527. For cases at the hearing level, the responsibility for determining a claimant's RFC rests with the ALJ. 20 C.F.R. §§ 416.946, 404.1546. Therefore, an ALJ clearly has the duty and authority to make an independent assessment of a claimant's RFC based on the evidence of record.

Discussion

An impairment is considered severe, only if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 404.916(c). Basic mental work activities include understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers, and usual work settings; and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1522, 416.922. The Commissioner's regulations explain the technique for evaluating whether a claimant's alleged mental impairment is severe. *See* 20 C.F.R. §§ 404.1520a, 416.920a.

In order to meet Listing 12.10 for an autistic disorder or other pervasive developmental disorder, including Asperger's syndrome, a claimant must establish: (1) Qualitative deficits in reciprocal social interaction; and (2) Qualitative deficits in verbal and non-verbal communication and in imaginative activity, that result in at least two of the following: (1)

15

marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation each of extended duration.[6] 20 C.F.R., pt. 404, subpt. P, app.1, § 12.10.

The ALJ found that Claimant did not meet all of the criteria for Listing 12.10, and did not satisfy the "paragraph B" criteria because he did not have two marked limitations or one marked limitation and repeated episodes of decompensation, each of extended duration (Tr. at 14). The ALJ found that Claimant had moderate restriction in his activities of daily living, moderate difficulties in social functioning, mild difficulties in concentration, persistence, or pace, and no episodes of decompensation (Tr. at 14-15).

In activities of daily living, the ALJ found Claimant has moderate restriction. The ALJ stated that Claimant did not drive and that Claimant has had difficulty adapting to real world finances and does not go out alone (Tr. at 14). The ALJ stated that Claimant had graduated from high school in regular classes and was able to prepare simple meals and perform household chores such as vacuuming, washing dishes, taking out trash, and cleaning the house. (*Id.*) Accordingly, the ALJ found that Claimant's moderate restriction in his daily activities, is due, in large part, to his reliance on his family members for transportation and for meal preparation (Tr. at 14-15).

The ALJ found that Claimant had only moderate difficulties in social functioning (Tr. at 15). The ALJ stated that Claimant self-reports that he has difficulty getting along with others and that he self-isolates, but the ALJ also noted that Claimant interacted appropriately with Ms. Robinson during his mental status examination and reported that he gets along well with

---

[6] This criteria is often referred to as "Paragraph B."

16

authority figures (Tr. at 15). During the examination with Ms. Robinson, Claimant was cooperative and had a good attitude; interacted appropriately; made normal eye contact; and engaged in spontaneous generation of conversation (Tr. at 414). Although Claimant reported that he did not socialize much outside of school, he testified that he had a handful of friends and people he talked to in school (Tr. at 45). Accordingly, the ALJ found that Claimant had moderate limitations in social functioning.

The ALJ found that Claimant had only mild difficulties in concentration, persistence, or pace (Tr. at 15). The ALJ found that Claimant had normal immediate, recent, and remote memory, and that his persistence and pace were all within normal limits (Tr. at 414). The ALJ stated that Claimant regularly plays video games and uses the internet, which supports his capacity to maintain concentration, persistence, and pace (Tr. at 15). Accordingly, the ALJ appropriately found that Claimant had only mild limitations in this area.

## RFC

Claimant asserts that the ALJ erroneously evaluated the checkbox mental assessments completed by Dr. DiCristofaro and Ms. Robinson in the RFC assessment. Dr. DiCristofaro indicated that Claimant had marked limitations in the following: relating to coworkers; using judgment; functioning independently; understanding, remembering and carrying out detailed or complex instructions; behaving in an emotionally stable manner; relating predictably in social situations; and possessing the ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (Tr. at 457-458). Ms. Robinson indicated that Claimant had marked limitations in the following: relating to coworkers; dealing with the public; dealing with work stress; maintaining attention/concentration; and understanding,

remembering and carrying out simple job instruction (Tr. at 465-467).

The ALJ evaluated the entire record of evidence, including the medical opinions, and found that Claimant retained the RFC to perform work at all exertional levels that is limited to brief and superficial interaction with the public or coworkers (Tr. at 15). The ALJ found that the opinions of Dr. DiCristofaro and Ms. Robinson are inconsistent with the evidence of record (Tr. at 19). The ALJ pointed out that although Claimant presented with normal concentration during his consultative examination and reported that he gets along "fine" with authority figures in his function report, Dr. DiCristofaro and Ms. Robinson reported that Claimant has extreme and marked limitations in maintaining concentration and attention, as well as marked and moderate limitations in interacting with supervisors.

The ALJ also found that although "Dr. DiCristofaro indicated that the claimant is unable to perform structured work independently," the record reflects that Claimant did not require special education services. (*Id.*) Additionally, the ALJ found that "although he did receive a 504 Education Plan, said plans did not include restrictions that support a finding of inability to perform structured work independently." (*Id.*)

The ALJ further pointed out inconsistencies between Ms. Robinson's allegation that Claimant has marked limitations in understanding, remembering and carrying out simple job instructions, and Claimant's own report that he does engage in household chores as well as video games, Legos and browsing the internet. The ALJ found that "Such activities are inconsistent with marked limitations in performing simple job instructions." (*Id.*)

"Under the Social Security Act, [a reviewing court] must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Id*. (alterations in original) (internal quotation marks omitted).

Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (internal quotation marks omitted). It "consists of more than a mere scintilla of evidence but may be less than a preponderance." *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir.1996). "In reviewing for substantial evidence, we do not undertake to reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [ALJ]." *Johnson v. Barnhart,* 434 F.3d 650, 653 (4th Cir. 2005). (alteration in original) (internal quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." *Id.* (alteration in original) (internal quotation marks omitted). In the present matter, the ALJ weighed the conflicting evidence and discusses the substantial evidence supporting the finding that Claimant does not meet Listing 12.10. Additionally, the ALJ's RFC included narrative discussion on the inconsistencies in the record to explain his independent assessment of Claimant's RFC based on the evidence of record.

## Conclusion

For the reasons provided above, the undersigned respectfully recommends the District Judge find that substantial evidence supports the ALJ's assessment of Claimant's RFC and that Claimant's mental impairment did not meet or medically equal the severity of Listing 12.10, therefore, Plaintiff's Memorandum in Support of Judgment on the Pleadings should be denied (ECF No. 14).

Accordingly, it is hereby respectfully **RECOMMENDED** that the presiding District Judge **DENY** Plaintiff's Memorandum in Support of Judgment on the Pleadings (ECF No. 14), **GRANT**

the Defendant's Brief in Support of the Defendant's Decision (ECF No. 15), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from this Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Judge Robert C. Chambers. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, Judge Chambers and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

Enter: August 10, 2018

_____
Dwane L. Tinsley
United States Magistrate Judge